UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

FEATHER RIVER TRIBAL HEALTH, INC.
and RIVERSIDE-SAN BERNARDINO
COUNTY INDIAN HEALTH, INC.,

                Plaintiffs,

vs.

MCKINSEY & COMPANY, INC.,

                Defendant.

MDL Member Case No. _____

**COMPLAINT**

JURY TRIAL DEMANDED

2133245.2

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    INTRODUCTION ........................................................................................ 1

II.   JURISDICTION AND VENUE................................................................. 2

III.  PARTIES ................................................................................................... 2

A.   PLAINTIFF FEATHER RIVER TRIBAL HEALTH, INC.................................... 2

B.   PLAINTIFF RIVERSIDE-SAN BERNARDINO COUNTY INDIAN HEALTH, INC. ............................................................................................ 4

      C.    Defendant .......................................................................................... 7

IV.  FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS .............................. 8

      A.    The Corporate Integrity Agreement ............................................. 8

      B.    McKinsey's Role Following the Corporate Integrity Agreement ............... 8

            1.    The Sacklers seek to divert money to themselves............................. 8

            2.    McKinsey supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation.................................................................................... 9

      C.    Project Turbocharge ................................................................... 10

      D.    McKinsey Knew About the Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway ........................... 12

      E.    Purdue's 2020 Guilty Plea and McKinsey's Recent Statement ................. 13

      F.    Impact of Opioid Abuse, Addiction and Diversion on American Indians and Alaska Natives ........................................................ 15

      G.    The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiff FRTH............................................................................. 17

      H.    The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiff RSBCIHI ....................................................................... 21

      I.    Tolling of Statutes of Limitations ............................................. 24

            1.    Equitable Estoppel and Fraudulent Concealment .......................... 24

            2.    McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine ............................................. 25

V.   FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE ............................... 26

# TABLE OF CONTENTS
(continued)

**Page**

    A.    The Common Purpose and Scheme of the Opioid Marketing Enterprise.................................................................................. 26

    B.    The Conduct of the Opioid Marketing Enterprise Violated Civil RICO ....................................................................................... 29

    C.    Pattern of Racketeering Activity ............................................... 31

VI.    CAUSES OF ACTION........................................................................ 35

    A.    Racketeer Influenced and Corrupt Organizations (RICO) 18 U.S.C. § 1961, et. seq...................................................................... 35

    B.    Negligence under California Law ............................................. 44

    C.    Public Nuisance - Cal. Civ. Code §§ 3479 and 3480................. 45

    D.    False Advertising Law (Ca. Bus. & Prof. Code § 17500)........... 49

    E.    Unjust Enrichment.................................................................... 50

    F.    Unfair Competition Law (Ca. Bus. & Prof. Code § 17200) ...... 51

VII.    PRAYER FOR RELIEF ...................................................................... 53

VIII.    JURY DEMAND................................................................................. 54

## I.   <u>INTRODUCTION</u>

1.      This case arises from the worst man-made epidemic in modern medical history—
the misuse, abuse, and over-prescription of opioids. This crisis arose from the opioid
manufacturers' deliberately deceptive marketing strategy to expand opioid use.

2.      McKinsey and Company, Inc. ("McKinsey" or "Defendant") played an integral
role in creating and deepening the opioid crisis.

3.      In the years following Purdue Pharma L.P.'s ("Purdue") 2007 guilty plea for
misleadingly marketing OxyContin, McKinsey worked closely with Purdue to dramatically
increase OxyContin sales to the benefit of McKinsey, Purdue, and the Sackler family, the
wealthy family that has owned and controlled Purdue for decades. McKinsey specifically sought
to maximize OxyContin sales by working around the requirements of the Corporate Integrity
Agreement that Purdue entered as part of its guilty plea. McKinsey also performed related work
for other manufacturers of opioids, including Johnson & Johnson. Through the conduct described
in this complaint, McKinsey participated in and helped orchestrate a broad scheme to deceptively
market opioids.

4.      McKinsey knew of the dangers of opioids and of Purdue's prior misconduct, but
nonetheless advised Purdue to improperly market and sell OxyContin, supplying granular sales
and marketing strategies and remaining intimately involved throughout implementation of those
strategies. McKinsey's actions resulted in a surge in sales of OxyContin and other opioids that
fueled and prolonged the opioid crisis.

5.      In a series of agreements, McKinsey has recently settled opioid-related claims
with 49 states (including California), the District of Columbia, and five U.S. territories.

6.      The Plaintiffs are intertribal consortia responsible for providing healthcare
services to citizens of their constituent tribes. Native Americans have disproportionately borne

the toll of the opioid crisis. Plaintiffs bring suit to hold McKinsey responsible for its role in that crisis, which has posed an existential threat to tribes and tribal communities.

## II.    JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action because the Plaintiffs bring a federal cause of action that raises a federal question pursuant to 28 U.S.C. § 1331. The Court also has supplemental jurisdiction over the Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

8.      This Court has personal jurisdiction over McKinsey because at all relevant times, McKinsey has purposely availed itself of the privilege of doing business in the State of Ohio and in this District, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in Ohio.

9.      Venue is proper in the United States District Court for the Northern District of Ohio under 28 U.S.C. § 1391(g) and 18 U.S.C. § 1965, and pursuant to paragraph 6(a) of Case Management Order 1, issued by this Court on April 11, 2018 in case number 1:17-CV-2804. Plaintiff hereby asserts that, but for that Order permitting direct filing in this District, Plaintiffs would have filed their cases in the U.S. District Court for the Central District of California because a substantial part of the events or omissions giving rise to this action occurred in California and because the Defendant is subject to the jurisdiction of the United States District Court for the Central District of California.

## III.    PARTIES

### A.    Plaintiff Feather River Tribal Health, Inc.

10.     Feather River Tribal Health, Inc. ("FRTH") is a Tribal government non-profit Indian health program with its principal place of business in Oroville, California. FRTH was

formed in 1993 to address the stark disparities in health care services available to Native American patients and Tribal communities in North-Eastern California. FRTH is a consortium of three sovereign, federally recognized Indian tribes in California: (1) the Tyme Maidu Tribe of the Berry Creek Rancheria; (2) the Mooretown Rancheria, Concow Maidu Tribe; and (3) the Enterprise Rancheria, Estom-Yumeka Maidu Tribe.

11.     FRTH serves as the Tribal government health agency for its founding consortium tribes. FRTH also serves members of other federally recognized tribes, including Native American patients and their families who reside within its service area and are eligible for FRTH's services. FRTH's constituent Tribes' governing bodies have each authorized FRTH to enter into a Self Governance Compact with the U.S. Secretary of the Department of Health and Human Services as authorized by Title V of the *Indian Self Determination Education and Assistance Act* (ISDEAA), and enter into a Funding Agreement under the Compact, on their behalf. FRTH's Compact with the Indian Health Service ("IHS") confirms that FRTH has "the power to decide how federal programs, services, functions and activities (or portions thereof) shall be funded and carried out from the Indian Health Service to FRTH."

12.     FRTH's Board of Directors is comprised of tribal delegates from each of these consortium tribes. The Board of Directors is comprised of nine members and three alternates who are responsible for overseeing FRTH's health programs, culturally appropriate services, and quality of health care, including monitoring its funding and grants. Each Tribe appoints three members and an alternate to serve on the board. The consortium tribes and their members rely on FRTH's health services. FRTH strives to provide culturally appropriate health care to its consortium tribes, incorporating Maidu culture, customs, and traditions into its health care services.

13.     FRTH provides a wide range of outpatient services to its Native American

patients and their families, which ranges from approximately 5,500 to 7,500 eligible patients per

year. FRTH provides comprehensive substance abuse and addiction treatment, domestic violence

programs, prisoner reentry programs, and mental health programs. FRTH provides patients who

suffer both directly and indirectly from alcohol and drug addiction, including opioid addiction,

specialized treatment through a portfolio of services. In addition to outpatient services, FRTH

contracts with third parties for inpatient rehabilitation programs, straining its limited

purchased/referred care dollars and diverting resources and funding away from other programs to

fight the opioid epidemic. FRTH provides these services to patients of all ages.

14.     The opioid epidemic has burdened FRTH with patients and their families who

require expanded patient services to treat and support opioid-related health, wellness and mental

health issues. These critical services often go unpaid and, in providing them, FRTH has

consequently incurred a considerable accumulation of unreimbursed costs. Additionally, FRTH

has incurred substantial costs fighting this epidemic by hiring additional staff and providers, as

well as providing pain management training and education to its staff and providers. With its

limited resources, FRTH has been forced to divert funds away from other priorities.

15.     FRTH directly and foreseeably sustained all economic damages alleged herein.

McKinsey's conduct has exacted a financial burden for which FRTH seeks relief. These damages

have been suffered and continue to be suffered directly by FRTH.

16.     FRTH also seeks its future costs it will incur in caring for its patients as the

epidemic created by McKinsey's wrongful and/or unlawful conduct continues.

**B.     Plaintiff Riverside-San Bernardino County Indian Health, Inc.**

17.     Riverside-San Bernardino County Indian Health, Inc. ("RSBCIHI") is a Tribal

government Indian health program founded and operated by a consortium of federally

recognized, sovereign Indian tribes in California. RSBCIHI was originally formed in 1968 to address the stark disparity in health care services available to Native Americans in Southern California, and to provide culturally appropriate, high quality health care services to the under-resourced and under-served Tribal members of the founding tribes.

18.     RSBCIHI is a consortium of nine tribes located throughout Riverside and San-Bernardino Counties. The governing body of each consortium member tribe has duly authorized RSBCIHI to enter into a Self-Governance Compact with the U.S. Secretary of the Department of Health and Human Services, as authorized by Title V of the *Indian Self Determination Education and Assistance Act* ("ISDEAA"), and into Funding Agreements under the Compact, on their behalf. RSBCIHI provides delegated government health care on behalf of its consortium tribes pursuant to its compact with the Indian Health Services ("IHS") under federal law.

19.     RSBCIHI receives the majority of its funding from IHS. RSBCIHI's Compact with IHS transfers to RSBCIHI "the power to decide how federal programs, services, functions and activities (or portions thereof) shall be funded and carried out from the Indian Health Service to RSBCIHI." RSBCIHI is the Tribal governmental health agency for its founding consortium tribes. RSBCIHI is now incorporated as a non-profit Tribal consortium health program with eight Indian Health Clinic locations both on and off Indian reservations throughout Riverside and San Bernardino counties.

20.     RSBCIHI provides a wide range of outpatient services at each of its eight Indian Health Clinic locations to approximately 17,500 Tribal member patients and their families. Some of these tribal members are members of other federally-recognized Indian tribes throughout the United States who are eligible for RSBCIHI's services because they reside in the "two county" service area of Riverside or San Bernardino County. RSBCIHI provides comprehensive

substance abuse and addiction treatment, domestic violence treatment and prevention, and mental health programs. RSBCIHI provides patients who suffer both directly and indirectly from alcohol and drug addiction specialized treatment through a portfolio of services, including its Tribal Opioids Program. RSBCIHI provides these services to patients of all ages.

21.     RSBCIHI also contracts for needed in-patient and specialty care services, including detoxification, inpatient rehabilitation, and specialty outpatient services, with third party providers. The opioid epidemic has increased the demand for RSBCIHI's substance abuse, mental health, and specialty services. These services, especially costly in-patient detoxification, rehabilitation and after-care programs, strain RSBCIHI's limited funds for such expensive services. In providing them, RSBCIHI has consequently reprioritized health care services in other areas, and redirected already inadequate funds for ambulatory care to address the consequences of opiate addiction.

22.     RSBCIHI provides culturally appropriate healthcare services for members of the nine sovereign Native American tribes that oversee and operate RSBCIHI, including: (1) Agua-Caliente Band Of Cahuilla Indians; (2) Pechanga Band Of Luiseño Mission Indians; (3) Ramona Band Of Cahuilla Indians; (4) Cahuilla Band Of Indians; (5) Soboba Band Of Luiseño Indians; (6) Morongo Band Of Mission Indians; (7) Santa Rosa Band Of Cahuilla Indians; (8) San Manuel Band Of Mission Indians; and (9) Torres-Martinez Desert Cahuilla Indians.

23.     RSBCIHI's Board of Directors is comprised of tribal leaders from each of these nine tribes. The Board of Directors is responsible for overseeing all of RSBCIHI's Indian Health Clinic locations, programs, quality of care, culturally appropriate services, funding, and grants. Under the Board's leadership, RSBCIHI has implemented new policies and procedures to address and monitor the opioid crisis, including: pain management agreements; providing

2133245.2

training; additional policies to monitor and address opioid prescription "shopping"; and the addition of staff, providers, programs, and services for its patients. The Board has authorized RSBCIHI to incur these additional, substantial costs to combat this epidemic. The Board has further prioritized an expansion of RSBCIHI's internal Behavioral Health staffing capacity by hiring an additional psychiatrist, psychologist, licensed clinical social worker, medical assistant, and pain management/addiction specialist.  The Board has further authorized the hiring of additional Behavioral Health staff to coordinate patient care and referrals between its Medical and Behavioral Health Services Departments, ensuring that patients are seamlessly referred to Behavioral Health as needed.

24.     RSBCIHI directly and foreseeably sustained all economic damages alleged herein. McKinsey's conduct has exacted a financial burden for which RSBCIHI seeks relief. These damages have been suffered and continue to be suffered directly by RSBCIHI. With its limited resources, RSBCIHI has been forced to divert funds away from other priorities.

25.     RSBCIHI also seeks its future costs it will incur in caring for its patients as the epidemic created by McKinsey's wrongful and/or unlawful conduct continues.

## C.     **Defendant**

26.     Defendant McKinsey and Company, Inc. is a corporation organized under the laws of the state of New York. McKinsey's principal place of business is located at 711 Third Avenue, New York, NY 10017.

27.     McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has provided related consulting services to other manufacturers of opioids.

## IV.   FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### A.   The Corporate Integrity Agreement

28.     In May of 2007, Purdue Frederick Company, the parent company of Purdue Pharma L.P. ("Purdue") pleaded guilty to charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. In pleading guilty, Purdue admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

29.     In the global settlement resolution, Purdue and its parent company paid over $600 million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and Human Services Office of Inspector General.

30.     Under the Corporate Integrity Agreement, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices. Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

### B.   McKinsey's Role Following the Corporate Integrity Agreement

#### 1.   The Sacklers seek to divert money to themselves.

31.     The Sackler family is among the richest families in the United States. Members of the Sackler family have controlled Purdue at all times relevant to this complaint.

32.     Following the guilty plea, the Sacklers sought to insulate themselves from the risk they perceived in Purdue. Email threads between the Sacklers in early 2008 indicate that the Sacklers had become concerned about personal liability regarding opioid-related misconduct.

33.     The Sacklers considered selling Purdue or merging with another pharmaceutical company as an option for limiting their risk. Mortimer Sackler Jr. advocated for a sale or merger in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile

and risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to misconduct in the marketing and sale of OxyContin.

34.     Alternatively, the Sacklers considered extracting as much wealth as possible from Purdue through distributions to themselves as shareholders. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

35.     Either option -- a sale or significant distributions to shareholders -- would require Purdue to increase profitability in the short term. Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

## 2.     McKinsey supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation

36.     McKinsey touts its model of engaging in transformational partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

37.     McKinsey had begun collaborating with Purdue by June 2009. McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement, which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

38.     McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had

developed could generate as much as $400,000,000 in additional annual sales. McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

39. OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

40. In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

41. McKinsey helped shape Purdue's OxyContin marketing, which misleadingly centered on freedom and peace of mind for users. The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what Purdue and McKinsey knew about opioids. One advertisement said, "we sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

42. McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

**C.    Project Turbocharge**

43. The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

44.     In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

45.     McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

46.     Also as part of the "Project Turbocharge" recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.

47.     Despite knowing that then-recently-expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

48.     At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting.

49.     Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

50.     McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

51.     At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

52.     With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to Evolve to Excellence.

53.     McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

54.     The Sacklers did not sell Purdue or enter into a merger, but their goal of extracting wealth from the business was realized. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

### D.     McKinsey Knew About the Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyway

55.     McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a McKinsey

PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

56.     Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

57.     McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

58.     McKinsey continued working with Purdue long after the severity of the opioid crisis was well known. In 2017, McKinsey proposed that Purdue pay CVS and other distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

59.     A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition...They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

60.     In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

### E.     Purdue's 2020 Guilty Plea and McKinsey's Recent Statement

61.     In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

62.     In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids--frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

63.     The 2020 Settlement Agreement was entered by Purdue and the United States government. It explicitly states that it does not release Purdue of "[a]ny liability for claims of the states or Indian tribes."

64.     The 2020 Settlement Agreement includes a provision specifically reserving claims regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors, including consultants."

65.     On December 5, 2020, McKinsey issued the following statement regarding its work with Purdue:

> *December 5, 2020*—As we look back at our client service during the opioid crisis, we recognize that we did not adequately acknowledge the epidemic unfolding in our communities or the terrible impact of opioid misuse and addiction on millions of families across the country. That is why last year we stopped doing any work on opioid-specific business, anywhere in the world.
>
> Our work with Purdue was designed to support the legal prescription and use of opioids for patients with legitimate medical needs, and any suggestion that our work sought to increase overdoses or misuse and worsen a public health crisis is wrong. That said, we recognize that we have a responsibility to take into account the broader context and implications of the work that we do. Our work for Purdue fell short of that standard.
>
> We have been undertaking a full review of the work in question, including into the 2018 email exchange which referenced potential deletion of documents. We continue to cooperate fully with the authorities investigating these matters.

66.      In recent weeks, McKinsey has settled opioid-related claims with 49 states, the District of Columbia, and five U.S. territories.

**F.      Impact of Opioid Abuse, Addiction and Diversion on American Indians and Alaska Natives**

67.      There are 574 federally recognized tribes in the United States, located within the borders of 35 states. They are diverse in terms of their size, geography, culture, and resources, but they share a status as sovereign governments responsible for the health and well-being of their citizens.

68.      Native Americans have disproportionately borne the toll of the opioid crisis.

69.      Native Americans suffer the highest per capita rate of opioid overdoses.

70.      According to the Indian Health Service ("IHS"), there has been a "four-fold increase in opioid overdoses from 1999 to 2013 among American Indians and Alaska Natives . . . [T]wice the rate of the general U.S. population."

71.      The CDC reported that the "rates of death from prescription opioid overdose among American Indian or Alaska Natives increased almost four-fold from 1.3 per 100,000 in 1999 to 5.1 per 100,000 in 2013."  By 2014, the CDC reported "8.4 per 100,000 Native Americans were dying of opioid overdoses, the highest number of any racial demographic."

72.      In 2014, Native Americans had the highest death rate from opioid overdoses out of any ethnic group in the country.

73.      The impact on Native American children is particularly devastating. In a study conducted to examine substance-related disorders among adolescents across racial and ethnic groups, "Racial/Ethnic Variations in Substance-Related Disorders Among Adolescents in the United States," the authors found, of 72,561 adolescents aged 12 to 17 years:

a.      Analgesic opioids were the second most commonly used illegal drug after marijuana;

b.      Analgesic opioid use was comparatively prevalent among Native American adolescents (9.7%);

c.      Native Americans have the highest prevalence of use (47.5%) and disorders (15.0%); and

d.      31.5% of Native Americans had substance-related disorders.

74.      The study concluded:

Native Americans have the highest prevalence of substance use and substance-related disorders, adding to evidence that young Native Americans are a vulnerable group facing numerous stressors, trauma, and health disparities (e.g., highest rate of suicide, underfunded systems of care, and lack of access to appropriate care). The results herein highlight a critical need for intervention to reduce their burdens from substance use and for policies to address presently underfunded systems of care and improve infrastructures linking behavioral and primary health care services. [footnotes omitted.]

75.      The CDC reported that approximately 1 in 10 Native American youths ages 12 or older used prescription opioids for nonmedical purposes in 2012, double the rate for white youth.

76.      The fact that adolescents are able to easily obtain prescription opioids through the black market created by opioid diversion highlights the direct impact on Plaintiffs and their communities by Purdue and McKinsey's actions and inactions.

77.      Even the youngest members of tribal communities bear the consequences of the opioid abuse epidemic fueled by McKinsey's conduct working with Purdue and other manufacturers of opioids.  Between 2009 and 2012, "American Indian women [were] 8.7 times more likely to be diagnosed with maternal opiate dependence or abuse during pregnancy," compared to non-Hispanic women.  That translates into 1 in 10 pregnancies among American

Indian women. As a result, many tribal infants suffer from opioid withdrawal and Neonatal Abstinence Syndrome ("NAS").

78. Infants suffering from NAS are separated from their families and placed into the custody of the tribal child welfare services or receive other government services so they can be afforded medical treatment and be protected from drug-addicted parents.

79. The impact of NAS can be life-long. Most NAS infants are immediately transferred to a neonatal intensive care unit for a period of days, weeks, or even months. NAS can also require an emergency evacuation for care to save the infant's life. Such emergency transportation costs thousands of dollars for each occurrence.

80. Many NAS infants have short-term and long-term developmental issues that prevent them from meeting basic cognitive and motor-skills milestones. Many will suffer from vision and digestive issues; some are unable to attend full days of school. These disabilities follow these children through elementary school and beyond.

81. Many of the parents of these children continue to relapse into prescription opioid use and abuse, having an impact on their families and tribal communities for financial and other support.

### G. The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiff FRTH

82. FRTH's own experience treating opioids illustrates these national trends and those of tribal communities generally.

83. The flood of opioids into FRTH's Tribal communities as a result of the misconduct of McKinsey and opioid manufacturers has devastated FRTH and its Tribal communities and patient population.

84.     FRTH's mission is to protect and promote the health and welfare of Native Americans and their families in its service area, and all people in FRTH's Tribal communities, to the highest level possible through a comprehensive system of culturally appropriate preventive and therapeutic services. In line with FRTH's mission, FRTH has taken proactive measures and implemented numerous positive changes to fight against prescription opioid abuse in FRTH's community. FRTH has spent millions of dollars in both outpatient treatment services, and in contracting with third parties for in-patient rehabilitation programs, straining its limited purchased/referred care ("PRC") dollars and diverting resources and funding away from other programs to fight the opioid epidemic.

85.     FRTH has created and implemented programs specifically intended to deal with the opioid epidemic for its patients, their families, and their Tribal communities. To date, FRTH has implemented various lifestyle management and alternative therapy programs to combat the opioid epidemic, including: acupuncture; massage; chiropractic services; aquatic therapy; and behavioral health classes. FRTH offers an array of patient services, including an intensive outpatient substance abuse program, which was developed due to lack of this type of program to address the growing need in its patient population.

86.     One of the measures FRTH implemented to address the growing need for opioid-related services in its Tribal communities includes the expansion of FRTH's Oroville clinic. The Oroville clinic is a 41,000 sq. ft. facility serving the greater Oroville area. Built in 2000, and expanded in 2008, the clinic now provides expanded medical and behavioral health services, as well as a pharmacy. The clinic also hosts Lab Services through Quest Diagnostic. The Oroville Clinic was expanded in part to respond to the opioid crisis and the unmet needs of its patients facing opioid addiction.

87.     Most recently, FRTH constructed a Wellness Center in 2018 in part in response to the growing opioid epidemic. The purpose of the Wellness Center is to provide Native American patients and their families with drug-free options to address their opioid addiction and pain management in order to avoid relapse. This holistic approach embraces mind, body and spirit. Acupuncture, chiropractic, massage therapy, physical therapy, exercise and aquatic therapy will be used as a replacement for medications. Coupled with the treatment and recovery program, the Wellness Center is being used as a long-term solution to this devastating problem.

88.     The Wellness Center also hosts a program titled, Red Road to Wellbriety: White Bison, Inc. This program is a "Best Practices" program for treatment and recovery specifically designed for American Indians and Alaska Native populations. Through the Wellbriety program, the Wellness Center takes a culturally-based and holistic approach to addiction treatment – including opioid addiction. This program promotes overall health and employs the Medicine Wheel and 12 -step program approach to encourage patients to treat their mind, spirit, and body to overcome addiction, which is in line with traditional Native American traditions, customs and practices. The program assists patients in acclimating back into the community after treatment, as well as assisting the patients' families, to promote continuing wellness and sobriety through after-care treatment and services.

89.     FRTH has also increased its number of employees, providers, and contractors to address the opioid crisis by adding pain management physicians, primary care physicians, chiropractors, acupuncture provider, psychiatrists, and additional administrative and support staff to address the increased need created by the epidemic. FRTH has expanded and improved its pain management education, training, monitoring, and security by providing additional pain management education and training opportunities. FRTH has further increased access to

specialty care, pharmacy education, and counseling for its patients. Additionally, FRTH has

facilitated specific opioid addiction prevention treatment and recovery strategies, including better

diagnosis of addiction, medical assistance therapy, naloxone use, and, strategies to address the

root causes of addiction. Finally, FRTH has implemented community education and outreach

strategies to increase awareness, education, wellness, and offer prevention activities.

90.     These necessary additional employees and services come at a significant cost to

FRTH. In the absence of this epidemic, FRTH could use those resources in other areas of need.

The majority of FRTH's funding comes its Compact with IHS, which is underfunded. In 2017,

the national average of health care spending per capita was $9,207, while IHS spent an average

of $3,332 per capita. Due to this chronic underfunding, IHS is unable to adequately adjust funds

to meet the increased healthcare needs of FRTH's patient population. FRTH's funding has not

adequately increased to counteract the increased costs of the opioid epidemic. FRTH has had to

divert funding from other programs and services in order to deal with the opioid crisis. This

diversion is particularly harmful in the negative effect it has on the time and funding available to

address other catastrophic diseases, such as diabetes and pulmonary disease, that

disproportionately affect Native American populations and are highly prevalent in FRTH's

patient population.

91.     FRTH has been significantly damaged by the effects of the unlawful conduct

described in this complaint, including in the form of increased healthcare costs, increased costs

to care for children born with NAS, and strain on FRTH's ability to address other health and

wellness issues given its limited resources.

**H.**    **The Impact of McKinsey's Work with Opioid Manufacturers on Plaintiff RSBCIHI**

92.    RSBCIHI's own experience treating opioids illustrates the national trends and those of tribal communities generally described in this complaint.

93.    RSBCIHI has taken proactive measures in its Tribal communities to fight against prescription opioid abuse by expanding its behavioral health, pain management, and related services for its Native American patients and their families. RSBCIHI has spent millions of dollars in both outpatient treatment services, and in contracting with other providers for inpatient treatment services, to address opioid addiction and issues stemming from opioid addiction. RSBCIHI has also implemented pain management agreements and policies to assist and monitor patients at risk of opioid addiction, as well as additional training and education for its providers.

94.    RSBCIHI has about 100,000 visits from its patients each year. Those patients are approximately 17,500 Native Americans and their families. RSBCIHI is the largest Native American healthcare organization in California, with eight Indian Health Clinics in Riverside and San Bernardino counties. The fundamental purpose of RSBCIHI is to provide culturally sensitive, high quality healthcare that is respectful of the traditional customs of the Native American communities it serves. RSBCIHI also promotes a holistic approach to wellness, and provides early intervention to support healthy lifestyles in Tribal communities.

95.    In line with RSBCIHI's purpose and mission, it has implemented measures to address a variety of behavioral health issues, including opioid-related issues. RSBCIHI has designed and implemented programs, including a Tribal Opioids Program, to deal with the opioid epidemic in the communities it serves. For example, RSBCIHI has set up PHQ-9 kiosks, which provide questionnaires to patients and screen for various behavioral and mental health issues. These questionnaires provide RSBCIHI health professionals with valuable information

regarding RSBCIHI's patient population and areas of additional need in its Tribal communities. Additionally, RSBCIHI has established a registry system to identify patients who are taking multiple controlled substances. As a result of the registry, RSBCIHI has implemented protocols and pain management agreements to allow it to more closely monitor its patients and assist them with addiction and addiction-related issues.

96.     RSBCIHI has implemented numerous changes to combat the epidemic. RSBCIHI has increased its staff by adding a pain management/addiction specialist, psychologist, psychiatrist, licensed clinical social worker, alcohol and drug counselor, medical assistant, and additional support staff to address the increased need created by the epidemic. RSBCIHI has also hired additional Behavioral Health staff to coordinate patient services and referrals between its Medical and Behavioral Health Departments, ensuring that its patients are seamlessly referred to Behavioral Health as needed. RSBCIHI has further expanded and improved its education and training opportunities, monitoring and security systems, and pain management protocols and policies. RSBCIHI has specifically provided additional pain management education to its providers, and increased access to specialty care and counseling for its patients. Additionally, RSBCIHI has developed a Tribal Opioids Program and facilitated specific opioid addiction prevention treatment and recovery strategies, including medical assistance therapy, naloxone use, and strategies to address the root causes of addiction. Finally, RSBCIHI has implemented community outreach strategies to increase awareness, education, wellness, and prevention activities.

97.     These necessary additional services come at a significant cost to RSBCIHI. The majority of RSBCIHI funding comes its Compact with IHS, which is underfunded. In 2017, the national average of health care spending per capita was $9,207, while IHS spent an average of

$3,332 per capita. Due to this chronic underfunding, IHS is unable to adequately adjust funds to meet the increased healthcare needs of RSBCIHI's patient population. RSBCIHI's funding has not increased enough to counteract the increased costs of fighting the opioid epidemic through prevention and recovery services. RSBCIHI has had to divert critical IHS funding, including limited dollars for the purchase of specialty care from outside providers, from other programs and services in order to deal with the opioid crisis. In the absence of this epidemic, RSBCIHI could have used limited IHS resources in other areas of critical need.

98.     The opioid epidemic has substantially impacted RSBCIHI, because many of its patients require expanded pain management, behavioral health, rehabilitation, and related in-patient and out-patient services for extended periods of time. In 2016 and 2017 combined, RSBCIHI's Behavioral Health Services program received positive drug test results for at least 45 adults for opioids. Based on these drug tests, RSBICHI contracted with third party providers to place 21 adults into costly rehabilitation treatment programs for heroin/opioid abuse. Additionally, in the past five years, RSBCIHI's Behavioral Health Services has recorded at least two deaths due to opioid use. RSBCIHI believes that opioid drug use is generally under-reported by its patient population. Therefore, RSBCIHI believes that these numbers do not accurately reflect the harmful impacts the opioid epidemic has had on RSBCIHI's patient population and the Tribal communities it serves.

99.     RSBCIHI has been significantly damaged by the effects of the unlawful conduct described in this complaint. Specifically, RSBCIHI has been forced to divert its limited IHS resources and other funding to patients facing opioid addiction and their families. McKinsey's misconduct and the resulting opioid crisis has diminished RSBCIHI's ability to combat other

addiction and health related issues, required RSBCIHI to hire additional staff and implement new services, and increased poverty among RSBCIHI's service population.

## I.    Tolling of Statutes of Limitations

### 1.    Equitable Estoppel and Fraudulent Concealment

100.    McKinsey is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, McKinsey undertook active efforts to deceive the Plaintiffs and to purposefully conceal their unlawful conduct and fraudulently assure the public and the Plaintiffs that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits.  Notwithstanding the allegations set forth above, McKinsey and Purdue affirmatively assured the public and Plaintiffs that they were working to curb the opioid epidemic.

101.    McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

102.    McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

103.    McKinsey and Purdue also concealed from Plaintiffs the existence of the Plaintiffs' claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These

repeated misrepresentations misled regulators, prescribers and the public, including the

Plaintiffs, and deprived Plaintiffs of actual or implied knowledge of facts sufficient to put the

Plaintiffs on notice of potential claims.

104.    The Plaintiffs did not discover the nature, scope and magnitude of McKinsey's

misconduct, and its full impact on Plaintiffs, and could not have acquired such knowledge earlier

through the exercise of reasonable diligence.

105.    Purdue and McKinsey's campaign to misrepresent and conceal the truth about the

opioid drugs that they were aggressively pushing on the Plaintiffs deceived the medical

community, consumers, and the Plaintiffs.

106.    Further, Purdue and other opioid manufacturers also concealed and prevented

discovery of information, including data from the ARCOS database.

107.    McKinsey intended that their actions and omissions made with Purdue would be

relied upon, including by the Plaintiffs.  The Plaintiffs did not know and did not have the means

to know the truth, due to McKinsey and Purdue's actions and omissions.

108.    The Plaintiffs reasonably relied on McKinsey and Purdue's affirmative statements

regarding their purported compliance with their obligations under the law and consent orders.

## 2.    McKinsey and Purdue Persisted in The Fraudulent Scheme Despite a Guilty Plea and Large Fine

109.    In May 2007, Purdue and three of its executives pled guilty to federal charges of

misbranding OxyContin in what the company acknowledged was an attempt to mislead doctors

about the risk of addiction.  Purdue was ordered to pay $600 million in fines and fees.  In its

plea, Purdue admitted that its promotion of OxyContin was misleading and inaccurate,

misrepresented the risk of addiction and was unsupported by science.  Additionally, Michael

Friedman, the company's president, pled guilty to a misbranding charge and agreed to pay $19

million in fines; Howard R. Udell, Purdue's top lawyer, also pled guilty and agreed to pay $8 million in fines; and Paul D. Goldenheim, its former medical director, pled guilty as well and agreed to pay $7.5 million in fines.

110.    Nevertheless, even after the settlement, Purdue continued to pay doctors on speakers' bureaus to promote the liberal prescribing of OxyContin for chronic pain and fund seemingly neutral organizations to disseminate the message that opioids were non-addictive as well as other misrepresentations.  At least until early 2018, Purdue continued to deceptively market the benefits of opioids for chronic pain while diminishing the associated dangers of addiction.  After Purdue made its guilty plea in 2007, it assembled an army of lobbyists to fight any legislative actions that might encroach on its business.  Between 2006 and 2015, Purdue and other painkiller producers, along with their associated nonprofits, spent nearly $900 million dollars on lobbying and political contributions— eight times what the gun lobby spent during that period. McKinsey participated extensively in these actions and provided Purdue with strategies and assistance to maximize sales as described in this complaint.

111.    As all of the government actions against the Purdue and McKinsey demonstrate, McKinsey knew that the actions it took with Purdue were unlawful, and yet deliberately proceeded in order to increase Purdue's sales and profits, and in turn to serve McKinsey's financial interests.

## V.    FACTUAL ALLEGATIONS PERTAINING TO CLAIMS UNDER THE RACKETEER-INFLUENCED AND CORRUPT ORGANIZATIONS (RICO) ACT: THE OPIOID MARKETING ENTERPRISE

### A.    The Common Purpose and Scheme of the Opioid Marketing Enterprise

112.    Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and non-cancer pain, McKinsey, which

participated in the marketing and sale of opioids as described in this complaint, and manufacturers of opioids, including Purdue, Johnson & Johnson, Cephalon, Janssen, Endo, and Mallinckrodt (collectively, including McKinsey, the "Opioid Marketing Enterprise Members") formed an association-in-fact enterprise and engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term chronic pain.

113.    In order to unlawfully increase the demand for opioids, the Opioid Marketing Enterprise Members formed an association-in-fact enterprise (the "Opioid Marketing Enterprise"). Through their personal relationships, the members of the Opioid Marketing Enterprise had the opportunity to form and take actions in furtherance of the Opioid Marketing Enterprise's common purpose. The Opioid Marketing Enterprise Members' substantial financial contribution to the Opioid Marketing Enterprise, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

114.    The Opioid Marketing Enterprise Members, through the Opioid Marketing Enterprise, concealed the true risks and dangers of opioids from the medical community and the public, including the Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included: (1) that addiction is rare among patients taking opioids for pain; (2) that addiction risk can be effectively managed; (3) that symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Opioid Marketing Enterprise Members named "pseudoaddiction"; (4) that withdrawal is easily managed; (5) that increased dosing presents no significant risks; (6) that long-term use of opioids improves function; (7) that

the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (8) that use of time-released dosing prevents addiction; (9) that abuse-deterrent formulations provide a solution to opioid abuse; and (10) that opioids would bring patients freedom and peace of mind.

115.    The scheme devised, implemented and conducted by the Opioid Marketing Enterprise Members was a common course of conduct designed to ensure that the Opioid Marketing Enterprise Members unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of the Opioid Marketing Enterprise Members' drugs.  The Opioid Marketing Enterprise Members acted together for a common purpose and perpetuated the Opioid Marketing Enterprise's scheme, including through the unbranded promotion and marketing network as described above.

116.    There was regular communication between the Opioid Marketing Enterprise Members in which information was shared, misrepresentations were coordinated, and payments were exchanged. The Opioid Marketing Enterprise Members functioned as a continuing unit for the purpose of implementing the Opioid Marketing Enterprise's scheme and common purpose, and each agreed and took actions to hide the scheme and continue its existence.

117.    As public scrutiny and media coverage focused on how opioids ravaged communities in throughout the United States, McKinsey did not challenge Purdue or other manufacturers' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the Opioid Marketing Enterprise, nor disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence. Instead, McKinsey continued to participate in the Opioid Marketing Enterprise for financial gain.

118.     The Opioid Marketing Enterprise Members engaged in certain discrete categories of activities in furtherance of the common purpose of the Opioid Marketing Enterprise. The Opioid Marketing Enterprise's conduct in furtherance of the common purpose of the Opioid Marketing Enterprise involved misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain, including targeting physicians with misleading claims.

119.     The impact of the Opioid Marketing Enterprise's scheme is still in place—*i.e.*, the opioids continue to be prescribed and used for chronic pain throughout the area of the Plaintiffs, and the epidemic continues to injure the Plaintiffs, and consume Plaintiffs' resources.

120.     As a result, it is clear that the Opioid Marketing Enterprise Members, including McKinsey, were each willing participants in the Opioid Marketing Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the Enterprise's purpose.

**B.     The Conduct of the Opioid Marketing Enterprise Violated Civil RICO**

121.     From at least 2004 to the present, each of the Opioid Marketing Enterprise Members exerted control over the Opioid Marketing Enterprise and participated in the operation or management of the affairs of the Opioid Marketing Enterprise, directly or indirectly, in the following ways:

a.     Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

b.      Creating and providing a body of deceptive, misleading and unsupported electronic and print advertisements about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

c.      Creating and providing a body of deceptive, misleading and unsupported sales and promotional training materials about opioids that (i) understated the risks and overstated the benefits of long-term use; (ii) appeared to be the result of independent, objective research; and (iii) was thus more likely to be relied upon by physicians, patients, and payors;

d.      Devised and implemented marketing schemes that included targeting and misleading physicians, unlawfully incentivizing sales representatives to maximize prescriptions and dosages, and evading regulatory constraints.

e.      Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications; and

f.      Using front groups and key opinion leaders ("KOLs") to mislead the public about opioids.

122.    The scheme devised and implemented by the Opioid Marketing Enterprise Members amounted to a common course of conduct intended to increase the Opioid Marketing Enterprise Members' sales from prescription opioids by encouraging the prescribing and use of opioids for long-term chronic pain.  The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

C.      **Pattern of Racketeering Activity**

123.    The Opioid Marketing Enterprise Members' scheme described herein was perpetrated, in part, through multiple acts of mail fraud and wire fraud, constituting a pattern of racketeering activity as described herein.

124.    The pattern of racketeering activity used by the Opioid Marketing Enterprise Members and the Opioid Marketing Enterprise likely involved thousands of separate instances of the use of the U.S. Mail or interstate wire facilities in furtherance of the unlawful Opioid Marketing Enterprise, including essentially uniform misrepresentations, concealments and material omissions regarding the beneficial uses and non-addictive qualities for the long-term treatment of chronic, non-acute and non-cancer pain, with the goal of profiting from increased sales of the Opioid Marketing Enterprise Members' drugs induced by consumers, prescribers, regulators and Plaintiffs' reliance on the Opioid Marketing Enterprise Members' misrepresentations.

125.    Each of these fraudulent mailings and interstate wire transmissions constitutes racketeering activity and collectively, these violations constitute a pattern of racketeering activity, through which the Opioid Marketing Enterprise Members defrauded and intended to defraud Plaintiffs, and other intended victims.

126.    The Opioid Marketing Enterprise Members devised and knowingly carried out an illegal scheme and artifice to defraud by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts regarding the safe, non-addictive and effective use of opioids for long-term chronic, non-acute and non-cancer pain.  The Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise knew that these representations violated the FDA approved use these drugs, and were not supported by actual evidence.  The Opioid Marketing Enterprise Members intended that their common purpose and

scheme to defraud would, and did, use the U.S. Mail and interstate wire facilities, intentionally and knowingly with the specific intent to advance, and for the purpose of executing, their illegal scheme.

127.   By intentionally concealing the material risks and affirmatively misrepresenting the benefits of using opioids for chronic pain, to, prescribers, regulators and the public, including the Plaintiffs, the Opioid Marketing Enterprise Members engaged in a fraudulent and unlawful course of conduct constituting a pattern of racketeering activity.

128.   The Opioid Marketing Enterprise Members' use of the U.S. Mail and interstate wire facilities to perpetrate the opioids marketing scheme involved thousands of communications, publications, representations, statements, electronic transmissions, payments, including, *inter alia*:

a.   Marketing materials about opioids, and their risks and benefits, which the Opioid Marketing Enterprise Members sent to health care providers, transmitted through the internet and television, published, and transmitted to front groups and KOLs located across the country and Plaintiffs;

b.   Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and front groups, regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally;

c.   Written representations and telephone calls among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and KOLs regarding the misrepresentations, marketing statements and claims about opioids, including the non-addictive, safe use of chronic long-term pain generally

       d.      E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the front groups agreeing to or implementing the opioids marketing scheme;

       e.      E-mails, telephone and written communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members and the KOLs agreeing to or implementing the opioids marketing scheme;

       f.      Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, front groups and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

       g.      Communications among the Opioid Marketing Enterprise Members, and between the Opioid Marketing Enterprise Members, KOLs and the media regarding publication, drafting of treatment guidelines, and the dissemination of the same as part of the Opioid Marketing Enterprise;

       h.      Written and oral communications directed to Plaintiffs and/or members of their constituent tribes and that fraudulently misrepresented the risks and benefits of using opioids for chronic pain; and

       i.      Receipts of increased profits sent through the U.S. Mail and interstate wire facilities—the wrongful proceeds of the scheme.

129.    In addition to the above-referenced predicate acts, it was intended by and foreseeable to the Opioid Marketing Enterprise Members that the front groups and the KOLs would distribute publications through the U.S. Mail and by interstate wire facilities, and, in those

publications, claim that the benefits of using opioids for chronic pain outweighed the risks of doing so.

130.    To achieve the common goal and purpose of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members and members of the Opioid Marketing Enterprise hid from the consumers, prescribers, regulators and the Plaintiffs: (a) the fraudulent nature of the Opioid Marketing Enterprise Members' marketing scheme; (b) the fraudulent nature of statements made by the Opioid Marketing Enterprise Members and by their KOLs, front groups and other third parties regarding the safety and efficacy of prescription opioids; and (c) the true nature of the relationship between the members of the Opioid Marketing Enterprise.

131.    The Opioid Marketing Enterprise Members, and each member of the Opioid Marketing Enterprise agreed, with knowledge and intent, to the overall objective of the Opioid Marketing Enterprise Members' fraudulent scheme and participated in the common course of conduct to commit acts of fraud and indecency in marketing prescription opioids.

132.    Indeed, for the Opioid Marketing Enterprise Members' fraudulent scheme to work, each of them had to agree to implement similar tactics regarding fraudulent marketing of prescription opioids.  This conclusion is supported by the fact that opioid manufacturers among the Opioid Marketing Enterprise Members financed, supported, and worked through the same KOLs and Front groups, and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines.

The Opioid Marketing Enterprise Members' predicate acts all had the purpose of creating the opioid epidemic that substantially injured Plaintiffs' business and property, while simultaneously generating billion-dollar revenue and profits for the Opioid Marketing Enterprise Members.  The predicate acts were committed or caused to be committed by the Opioid

Marketing Enterprise Members through their participation in the Opioid Marketing Enterprise and in furtherance of its fraudulent scheme.

## VI.    CAUSES OF ACTION

### A.    Racketeer Influenced and Corrupt Organizations (RICO) 18 U.S.C. § 1961, et. seq.

133.    Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

134.    This claim is brought by Plaintiffs against Defendant McKinsey for actual damages, treble damages, and equitable relief under 18.U.S.C. § 1964, for violations of 18 U.S.C. § 1961, et seq.

135.    At all relevant times, McKinsey is and has been a "person" under 18 U.S.C. § 1961(3) because it is capable of holding, and does hold, "a legal or beneficial interest in property."

136.    Each Plaintiff is a "person," as that term is defined in 18 U.S.C. § 1961(3), and has standing to sue as it was and is injured in its business and/or property as a result of Defendant's wrongful conduct described herein.

137.    The Opioid Marketing Enterprise conducted an association-in-fact enterprise, and/or participated in the conduct of an enterprise through a pattern of illegal activities (the predicate racketeering acts of mail and wire fraud) to carry-out the common purpose of the Opioid Marketing Enterprise, i.e., to unlawfully increase profits and revenues from the continued prescription and use of opioids for long-term chronic pain.  Through the racketeering activities of the Opioid Marketing Enterprise, the Opioid Marketing Enterprise Members sought to further the common purpose of the enterprise through a fraudulent scheme to change prescriber habits and public perception about the safety and efficacy of opioid use.  In so doing, each of the Opioid

Marketing Enterprise Members knowingly conducted and participated in the conduct of the Opioid Marketing Activities by engaging in mail and wire fraud in violation of 18 U.S.C. §§ 1962(c) and (d).

138.     The Opioid Marketing Enterprise is an association-in-fact enterprise that consists of the Opioid Marketing Enterprise Members.

139.     Each of the Opioid Marketing Enterprise Members conducted and participated in the conduct of the Opioid Marketing Enterprise by playing a distinct role in furthering the enterprise's common purpose of increasing profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use, and the risks and symptoms of addiction, in order to increase the market for prescription opioids by changing prescriber habits and public perceptions.

140.     Specifically, the Opioid Marketing Enterprise Members each worked together to coordinate the enterprise's goals and conceal their role, and the enterprise's existence, from the public by, among other things, (i) funding, editing and distributing publications that supported and advanced their false messages; (ii) funding KOLs to further promote their false messages; and (iii) tasking their own employees to direct deceptive marketing materials and pitches directly at physicians.

141.     Further, each of the Opioid Marketing Enterprise Members had systematic links to and personal relationships with each other through joint participation in lobbying groups, trade industry organizations, contractual relationships and continuing coordination of activities.  The systematic links and personal relationships that were formed and developed allowed members of the Opioid Marketing Enterprise the opportunity to form the common purpose and agree to conduct and participate in the conduct of the Opioid Marketing Enterprise.  Specifically, each of

the Opioid Marketing Enterprise Members, including McKinsey working with and through the

other Opioid Marketing Enterprise Members, coordinated their efforts through the same KOLs

and front groups, based on their agreement and understanding that the front groups and KOLs

were industry friendly and would work together with the Opioid Marketing Enterprise Members

to advance the common purpose of the Opioid Marketing Enterprise; and each of the individuals

and entities that formed the Opioid Marketing Enterprise acted to enable the common purpose

and fraudulent scheme of the Opioid Marketing Enterprise.

142.    At all relevant times, the Opioid Marketing Enterprise: (a) had an existence

separate and distinct from each Opioid Marketing Defendant and its members; (b) was separate

and distinct from the pattern of racketeering in which the Opioid Marketing Enterprise Members

engaged; (c) was an ongoing and continuing organization consisting of individuals, persons, and

legal entities, including each of the Opioid Marketing Enterprise Members; (d) was characterized

by interpersonal relationships between and among each member of the Opioid Marketing

Enterprise; and (e) had sufficient longevity for the enterprise to pursue its purpose and

functioned as a continuing unit.

143.    The Opioid Marketing Enterprise Members conducted and participated in the

conduct of the Opioid Marketing Enterprise through a pattern of racketeering activity that

employed the use of mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and

§ 1343 (wire fraud), to increase profits and revenue by changing prescriber habits and public

perceptions in order to increase the prescription and use of prescription opioids, and expand the

market for opioids.

144.    The Opioid Marketing Enterprise Members each committed, conspired to commit,

and/or aided and abetted in the commission of at least two predicate acts of racketeering activity

(i.e. violations of 18 U.S.C. §§ 1341 and 1343) within the past ten years.  The multiple acts of

racketeering activity that the Opioid Marketing Enterprise Members committed, or aided and

abetted in the commission of, were related to each other, posed a threat of continued racketeering

activity, and therefore constitute a "pattern of racketeering activity."  The racketeering activity

was made possible by the Opioid Marketing Enterprise Members' regular use of the facilities,

services, distribution channels, and employees of the Opioid Marketing Enterprise, the U.S. Mail

and interstate wire facilities.  The Opioid Marketing Enterprise Members participated in the

scheme to defraud by using mail, telephones and the Internet to transmit mailings and wires in

interstate or foreign commerce.

145.    The Opioid Marketing Enterprise Members' predicate acts of racketeering (18

U.S.C. § 1961(1)) include, but are not limited to:

a.    Mail Fraud: The Opioid Marketing Enterprise Members violated 18

U.S.C. § 1341 by sending or receiving, or by causing to be sent and/or received, materials via

U.S. mail or commercial interstate carriers for the purpose of executing the unlawful scheme to

design, manufacture, market, and sell the prescription opioids by means of false pretenses,

misrepresentations, promises, and omissions.

b.    Wire Fraud: The Opioid Marketing Enterprise Members violated 18

U.S.C. § 1343 by transmitting and/or receiving, or by causing to be transmitted and/or received,

materials by wire for the purpose of executing the unlawful scheme to design, manufacture,

market, and sell the prescription opioids by means of false pretenses, misrepresentations,

promises, and omissions.

146.    Indeed, as summarized herein, the Opioid Marketing Enterprise Members used

the mail and wires to send or receive thousands of communications, publications,

representations, statements, electronic transmissions and payments to carry-out the Opioid

Marketing Enterprise's fraudulent scheme.

147.    Because the Opioid Marketing Enterprise Members disguised their participation

in the enterprise, and worked to keep even the enterprise's existence secret so as to give the false

appearance that their false messages reflected the views of independent third parties, many of the

precise dates of the Opioid Marketing Enterprise's uses of the U.S. Mail and interstate wire

facilities (and corresponding predicate acts of mail and wire fraud) have been hidden and cannot

be alleged without access to the books and records maintained by the Opioid Marketing

Enterprise Members, front groups, and KOLs.  Indeed, an essential part of the successful

operation of the Opioid Marketing Enterprise alleged herein depended upon secrecy.  However,

Plaintiffs have described the occasions on which the Opioid Marketing Enterprise Members

disseminated misrepresentations and false statements to consumers, prescribers, regulators, and

Plaintiffs, and how those acts were in furtherance of the scheme.

148.    Each instance of racketeering activity alleged herein was related, had similar

purposes, involved the same or similar participants and methods of commission, and had similar

results affecting similar victims, including consumers, prescribers, regulators and Plaintiffs.  The

Opioid Marketing Enterprise Members calculated and intentionally crafted the scheme and

common purpose of the Opioid Marketing Enterprise to ensure their own profits remained high.

In designing and implementing the scheme, the Opioid Marketing Enterprise Members

understood and intended that those in the distribution chain rely on the integrity of the

pharmaceutical companies and ostensibly neutral third parties to provide objective and scientific

evidence regarding the Opioid Marketing Enterprise Members' products.

149.     The Opioid Marketing Enterprise Members' pattern of racketeering activity alleged herein and the Opioid Marketing Enterprise are separate and distinct from each other. Likewise, the Opioid Marketing Enterprise Members are distinct from the Opioid Marketing Enterprise.

150.     The racketeering activities conducted by the Opioid Marketing Enterprise Members amounted to a common course of conduct, with a similar pattern and purpose, intended to deceive consumers, prescribers, regulators and the Plaintiffs.  Each separate use of the U.S. Mail and/or interstate wire facilities employed by the Opioid Marketing Enterprise Members was related, had similar intended purposes, involved similar participants and methods of execution, and had the same results affecting the same victims, including consumers, prescribers, regulators and the Plaintiffs.  The Opioid Marketing Enterprise Members have engaged in the pattern of racketeering activity for the purpose of conducting the ongoing business affairs of the Opioid Marketing Enterprise.

151.     Each of the Opioid Marketing Enterprise Members aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses.

152.     As described herein, the Opioid Marketing Enterprise Members engaged in a pattern of related and continuous predicate acts for years.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant money and revenue from the marketing and sale of their highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

153.    The Opioid Marketing Enterprise Members' violations of law and their pattern of racketeering activity directly and proximately caused the Plaintiffs injury in their business and property.  The Opioid Marketing Enterprise Members' pattern of racketeering activity logically, substantially and foreseeably caused an opioid epidemic.  Plaintiffs' injuries, as described below, were not unexpected, unforeseen or independent. Rather, as Plaintiffs allege, the Opioid Marketing Enterprise Members knew that the opioids were unsuited to treatment of long-term chronic, non-acute, and non-cancer pain, or for any other use not approved by the FDA, and knew that opioids were highly addictive and subject to abuse. Nevertheless, the Opioid Marketing Enterprise Members engaged in a scheme of deception that utilized the mail and wires in order to carry-out the Opioid Marketing Enterprises' fraudulent scheme, thereby increasing sales of their opioid products.

154.    It was foreseeable and expected that the Opioid Marketing Enterprise Members creating and then participating in the Opioid Marketing Enterprise through a pattern of racketeering activities to carry-out their fraudulent scheme would lead to a nationwide opioid epidemic, including increased opioid addiction and overdose.

155.    Defendant's misleading marketing and failure to prevent prescription opioid diversion damaged the Plaintiffs.  Defendant's misconduct has contributed to a range of social problems, including violence and delinquency.  Adverse social outcomes include child neglect, family dysfunction, babies born addicted to opioids, criminal behavior, poverty, property damage, unemployment, and social despair.  As a result, more and more of Plaintiffs' resources are devoted to addiction-related problems.

156.    Specifically, the Opioid Marketing Enterprise Members' creation of, and then participation in, the Opioid Marketing Enterprise through a pattern of racketeering activities to

carry-out their fraudulent scheme has injured Plaintiffs in the form of substantial losses of money and property that logically, directly and foreseeably arise from the opioid-addiction epidemic. Plaintiffs' injuries, as alleged throughout this complaint, and expressly incorporated herein by reference, include:

   a.     Costs for providing healthcare and medical care, additional therapeutic, and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths;

   b.     Costs of training first responders in the proper treatment of drug overdoses;

   c.     Costs associated with providing first responders with naloxone—an opioid antagonist used to block the deadly effects of opioids in the context of overdose;

   d.     Costs associated with emergency responses by first responders to opioid overdoses;

   e.     Costs for providing mental-health services, treatment, counseling, rehabilitation services, and social services to victims of the opioid epidemic and their families;

   f.     Costs for providing treatment of infants born with opioid-related medical conditions, or born dependent on opioids due to drug use by mother during pregnancy;

   g.     Costs associated with the injuries to the health and welfare of the Plaintiffs and members of their constituent tribes caused by the opioid epidemic; and

   h.     Diminished ability to address unrelated health issues because of the diversion of funding to address the opioid epidemic that would otherwise have been available to address other health issues.

157.    Plaintiffs' injuries were directly and thus proximately caused by these racketeering activities because they were the logical, substantial and foreseeable cause of Plaintiffs' injuries.  But for the opioid-addiction epidemic the Opioid Marketing Enterprise Members created through their Opioid Marketing Enterprise, Plaintiffs would not have lost money or property, and the health and welfare of Plaintiffs and members of their constituent tribes would not have been injured.

158.    The Plaintiffs are the most directly harmed entity and there are no other Plaintiffs better suited to seek a remedy for the economic harms at issue here.

159.    Plaintiffs seek all legal and equitable relief as allowed by law, including, inter alia, actual damages; treble damages; equitable and/or injunctive relief in the form of court-supervised corrective communication, actions and programs; forfeiture as deemed proper by the Court; attorneys' fees; all costs and expenses of suit; and pre- and post-judgment interest, including, inter alia:

      a.    Actual damages and treble damages, including pre-suit and post-judgment interest;

      b.    An order enjoining any further violations of RICO;

      c.    An order enjoining any further violations of any statutes alleged to have been violated in this Complaint;

      d.    An order enjoining the commission of any tortious conduct, as alleged in this Complaint;

      e.    An order enjoining any future marketing or misrepresentations regarding the health benefits or risks of prescription opioids use, except as specifically approved by the FDA;

      f.      An order enjoining any future marketing of opioids through non-branded marketing including through front groups, KOLs, websites, or in any other manner alleged in this Complaint that deviates from the manner or method in which such marketing has been approved by the FDA;

      g.      An order enjoining any future marketing to vulnerable populations, including but not limited to, persons over the age of fifty-five, anyone under the age of twenty-one, and veterans;

      h.      An order requiring McKinsey to publicly disclose all documents, communications, records, data, information, research or studies related to its work with Purdue and other manufacturers of opioids;

      i.      An order divesting McKinsey of any interest in, and the proceeds of any work related to opioids;

      j.      Forfeiture as deemed appropriate by the Court; and

      k.      Attorneys' fees and all costs and expenses of suit.

**B.**      **Negligence under California Law**

160.      Plaintiffs incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

161.      The opioid epidemic was a direct, legal, and proximate result of McKinsey's negligence. As a direct, proximate, and legal result of said negligence, Plaintiffs suffered damages as alleged herein.

162.      Through its work with Purdue and other opioid companies, McKinsey owed Plaintiffs duties of care. McKinsey's failure to comply with their duties of care proximately caused damage to Plaintiffs.

163.     The negligence of McKinsey was a substantial factor in causing Plaintiffs'
damages.

164.     As a further direct and proximate result of McKinsey's negligence, Plaintiffs
suffered damages including, but not limited to economic loss, business loss, emotional distress,
annoyance, disturbance, shame, inconvenience, drug addiction and/or dependency, and neonatal
abstinence syndrome.

165.     There is moral blame attached to McKinsey as a result of the terrible injuries and
suffering their misconduct caused, including the damage to Plaintiffs.

166.     Public policy supports finding a duty of care in this circumstance, and a finding of
a duty of care on McKinsey will also deter McKinsey from engaging in such behavior in the
future.

167.     Further, the conduct alleged against McKinsey in this complaint was despicable
and subjected the Plaintiffs to cruel and unjust hardship in conscious disregard of their rights,
constituting oppression, for which McKinsey must be punished by punitive and exemplary
damages in an amount according to proof. McKinsey's conduct evidences a conscious disregard
for the safety and welfare of others, including Plaintiffs and members of their constituent tribes.
McKinsey's conduct was and is despicable conduct and constitutes malice as defined by Civil
Code § 3294. An officer, director, or managing agent of McKinsey personally committed,
authorized, and/or ratified the despicable and wrongful conduct alleged in this complaint.

168.     Plaintiffs are entitled to an award of punitive damages sufficient to punish and
make an example of the Defendant.

### C.    Public Nuisance - Cal. Civ. Code §§ 3479 and 3480

169.     Plaintiffs incorporate by incorporate by reference all preceding paragraphs of this
complaint as if fully set forth herein, and further allege as follows:

170. Civil Code Section 3479 provides that "[a]nything that is injurious to health … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property … is a nuisance."

171. Civil Code Section 3480 defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

172. Civil Code section 3490 states that "[n]o lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."

173. Pursuant to Section 731 of the Civil Code, this action is brought by the Plaintiffs to abate the public nuisance created by the Defendant.

174. Defendant has created or assisted in the creation of a condition that is injurious to the health and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons served by the Plaintiffs in violation of Civil Code Sections 3479 and 3480.

175. The public nuisance is substantial and unreasonable. Defendant's actions caused and continue to cause the public health epidemic described above and that harm outweighs any offsetting benefit.

176. Defendant knew and should have known that their promotion of opioids was false and misleading and that their deceptive marketing scheme and other unlawful, unfair, and fraudulent actions would create or assist in the creation of the public nuisance—the opioid epidemic.

177. Defendant's actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Defendant's actions were, at the very least, a

substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without Defendant's actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

178.    The Defendant has breached their duties to the Plaintiffs by disseminating false and misleading information through Purdue regarding the dangers of opioid use and by targeting physicians likely to prescribe opioids for pain management despite the availability of other, less or non-addictive pain killers.

179.    Working through Purdue, McKinsey unlawfully provided false or misleading material information about prescription opioids or unlawfully failed to use reasonable care or comply with statutory requirements in the distribution of prescription opioids.

180.    McKinsey's acts and omissions created the opioid epidemic and thereby caused injury to the health of people the Plaintiffs serve and interfered with the comfortable enjoyment of life and property of others, specifically the Plaintiffs and the people they serve.

181.    McKinsey's acts and omissions offend decency and include the illegal sales of controlled substances.

182.    McKinsey's acts and omissions render people served by the Plaintiffs insecure.

183.    The Plaintiffs did not consent, expressly or impliedly, to the wrongful conduct of Defendant.

184.    As a direct and legal result of the conduct of McKinsey, Plaintiffs suffered harm that is different from the type of harm suffered by the general public. McKinsey's acts and omissions proximately caused injury to the Plaintiffs and the people they serve including, *inter alia*, recoupment of costs of providing or paying for the health care, pharmaceutical care, and

other necessary services of the Plaintiffs, flowing from an ongoing and persistent public nuisance which Plaintiffs seek to abate.

185.    McKinsey's acts and omissions affect the entire communities of the Plaintiffs.

186.    McKinsey also has a duty to abate the nuisance caused the by prescription opioid epidemic.

187.    The public nuisance created, perpetuated, and maintained by McKinsey can be abated and further recurrence of such harm and inconvenience can be abated.

188.    The hazardous condition which was created by and/or permitted to exist by McKinsey affected a substantial number of people at the same time within the general public, including Plaintiffs, and constituted a public nuisance under Civil Code §§ 3479 and 3480.

189.    McKinsey has failed to abate the nuisance they created.

190.    The Plaintiffs seek economic damages from the Defendant as reimbursement for the costs associated with past efforts to eliminate the hazards to public health and safety.

191.    Pursuant to Code of Civil Procedure § 731, the Plaintiffs seek an order providing for abatement of the public nuisance that Defendant created or assisted in the creation of, and enjoining Defendant from future violations of Civil Code §§ 3479 and 3480.

192.    The Plaintiffs seek economic damages from the Defendant to pay for the costs to permanently eliminate the hazards to public health and safety and abate the public nuisance.

193.    As a direct result of Defendant's conduct, the Plaintiffs and their communities have suffered actual injury and economic damages including, but not limited to, significant expenses for police, emergency, health, education and training, prosecution, child protection, corrections, judicial and other services.

194.     McKinsey is liable to the Plaintiffs for the costs borne by Plaintiffs as a result of the opioid epidemic and for the costs of abating the nuisance created by McKinsey.

**D.     False Advertising Law (Ca. Bus. & Prof. Code § 17500)**

195.     Plaintiffs incorporate by incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

196.     Business and Professions Code Section 17500 (the FAL) makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning . . . real or personal property . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

197.     As alleged above, Defendant's conduct working through Purdue was likely to deceive the Plaintiffs, who purchased or covered the purchase of opioids for chronic pain.

198.     At times, places, and involving participants known exclusively to Defendant and other parties and concealed from Plaintiffs, Defendant violated the FAL by making and disseminating false or misleading statements about the use of opioids to treat chronic pain, or by causing false or misleading statements about opioids to be made or disseminated to the public.

199.     Defendant violated the FAL by making statements to promote the use of opioids to treat chronic pain that omitted or concealed material facts, and by failing to correct prior misrepresentations and omissions, about the risks and benefits of opioids. Defendant's omissions, which are false and misleading in their own right, render even their seemingly truthful statements about opioids false and misleading.

200.     Defendant's statements about the use of opioids to treat chronic pain were not supported by or were contrary to the scientific evidence, as confirmed by later pronouncements of the CDC, the FDA, and confirmed by recent investigations based on that evidence.

201.     Defendant knew and should have known, at the time it made or disseminated the false and misleading statements or caused these statements to be made or disseminated, that the statements were false or misleading and therefore likely to deceive the public.

202.     In addition, Defendant knew and should have known that its false and misleading advertising created a false or misleading impression of the risks and benefits of long-term opioid use and would result in unnecessary and improper opioid prescriptions and use.

E.     **Unjust Enrichment**

203.     Plaintiffs incorporate by incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

204.     The Plaintiffs have expended substantial amounts of money to fix or mitigate the societal harms caused by Defendant's conduct.

205.     The expenditures by the Plaintiff in providing healthcare services to people who use opioids have added to Defendant's wealth. The expenditures by the Plaintiffs have helped sustain Defendant's businesses.

206.     The Plaintiffs have conferred a benefit upon Defendant by paying for what may be called Defendant's externalities-the costs of the harm caused by Defendant's negligent distribution and sales practices.

207.     Defendant is aware of this obvious benefit, and that retention of this benefit is unjust.

208.     Defendant made substantial profits while fueling the prescription drug epidemic in the Plaintiffs' communities.

209.     Defendant has been unjustly enriched by its negligent, intentional, malicious, oppressive, illegal and unethical acts, omissions, and wrongdoing.

210. It would be inequitable to allow Defendant to retain benefit or financial advantage.

211. The Plaintiffs demand judgment against the Defendant for restitution, disgorgement, and any other relief allowed in law or equity.

**F.** **Unfair Competition Law (Ca. Bus. & Prof. Code § 17200)**

212. Plaintiffs incorporate by incorporate by reference all preceding paragraphs of this complaint as if fully set forth herein, and further allege as follows:

213. Business and Professions Code Section 17200 (the UCL) prohibits any "unlawful, unfair or fraudulent business act or practice[]."

214. At times, places, and involving participants known exclusively to Defendant and other parties and concealed from Plaintiffs, Defendant has engaged in unlawful, unfair, and fraudulent business practices in violation of the UCL as set forth above. Defendant's business practices as described in this complaint are deceptive and violate the UCL because the practices are likely to deceive consumers in California.

215. Defendant knew and should have known at the time of making or disseminating these statements, or causing these statements to be made or disseminated, that such statements were false and misleading and therefore likely to deceive the public.

216. Defendant's omissions, which are deceptive and misleading in their own right, render even Defendant's seemingly truthful statements about opioids false and misleading. All of this conduct, separately and collectively, was likely to deceive California payors who purchased, or covered the purchase of, opioids for chronic pain.

217. Defendant's business practices as describe in this complaint are unlawful and violate the UCL.

218. These unlawful practices include, but are not limited to:

a.    Working through Purdue, McKinsey represented that opioids had sponsorship, approval, characteristics, ingredients, uses, or benefits which they did not have in violation of the Consumer Legal Remedies Act, Civ. Code § 1770(a)(5);

b.    Working through Purdue, McKinsey represented that opioids were of a particular standard, quality, or grade when they were of another in violation of Consumer Legal Remedies Act, Civ. Code § 1770(a)(7);

c.    Working through Purdue and other manufacturers of opioids, McKinsey made or disseminated, directly or indirectly, untrue, false, or misleading statements about the use of opioids to treat chronic pain, or causing untrue, false, or misleading statements about opioids to be made or disseminated to the general public in violation of the UCL.

d.    Working through Purdue, McKinsey directly or indirectly offered or paid remuneration to doctors to prescribe its opioid products in violation of Welf. & Inst. Code § 14107.2,

219.    Defendant's business practices as described in this complaint are unfair and violate the UCL because they offend established public policy, and because the harm they cause to consumers in California greatly outweighs any benefits associated with those practices.

220.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits, which it would not have received if it had not engaged in the violations of the UCL described in this complaint.

221.     As a direct and proximate result of the foregoing acts and practices, McKinsey have obtained an unfair advantage over similar businesses that have not engaged in such practices.

## VII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that the Court:

a.      Enter judgment against McKinsey and in favor of Plaintiffs;

b.      Award compensatory damages in an amount sufficient to compensate Plaintiffs fairly and completely for all damages, treble damages, pre-judgment and post-judgment interest as provided by law, and that such interest be awarded at the highest legal rate;

c.      Award damages caused by the opioid epidemic, including but not limited to (1) costs for providing medical care, additional therapeutic and prescription drug purchases including costs of obtaining naloxone and suboxone, as well as other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (2) costs for providing culturally-informed treatment, counseling, education and rehabilitation services; and (3) costs for providing treatment of infants born with opioid-related medical conditions, including NAS;

d.      Enter orders and procedures to abate the nuisance created by McKinsey's wrongful conduct;

e.      Enjoin McKinsey from continuing or repeating the wrongful conduct alleged herein and from the publication and/or dissemination of false and misleading materials directly or indirectly;

f.      Award Plaintiffs their costs of suit, including reasonable attorneys' fees as provided by law;

g.      Award such further and additional relief as the Court may deem just and proper under the circumstances; and

       h.      Grant Plaintiffs the right to amend their pleadings to conform to the

evidence produced at trial.

## VIII.  **<u>JURY DEMAND</u>**

Plaintiffs demand a trial by jury on all issues so triable.

DATED this 1st day of March, 2021.

By:  */s/*       *Mark P. Chalos*

Mark P. Chalos
mchalos@lchb.com
**LIEFF, CABRASER, HEIMANN &**
**BERNSTEIN, LLP**
222 2nd Ave. South, Suite 1640
Nashville, TN  37201
Telephone: (615) 313-9000
Facsimile: (615) 313-9965

Eric B. Fastiff
efastiff@lchb.com
Elizabeth J. Cabraser
ecabraser@lchb.com
**LIEFF, CABRASER, HEIMANN &**
**BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008

Rovianne A. Leigh
rleigh@berkeywilliams.com
Scott W. Williams
swilliams@berkeywilliams.com
**BERKEY WILLIAMS LLP**
2030 Addison Street, Suite 410
Berkeley, CA 94704
Telephone: (510) 548-7070
Facsimile: (510) 548-7080

Dan Drachler
ddrachler@zsz.com
Henry Avery
havery@zsz.com
**ZWERLING, SCHACHTER & ZWERLING, LLP**
1904 Third Avenue, Suite 1030
Seattle, WA  98101
Telephone: (206) 223-2053
Facsimile: (206) 343-9636

Robert S. Schachter
rschachter@zsz.com
Sona R. Shah
sshah@zsz.com
**ZWERLING, SCHACHTER & ZWERLING, LLP**
41 Madison Avenue
New York, NY 10010
Telephone: (212) 223-3900
Facsimile: (212) 371-5969

*Attorneys for Plaintiffs*